159 F.3d 1161
 98 Cal. Daily Op. Serv. 7753, 98 Cal. Daily
Op. Serv. 7843,
98 Daily Journal D.A.R. 10,754
Katie VARGAS, on behalf of her next friend, Jeremy Vargas
Sagastegui, Plaintiff-Appellant,
v.
John LAMBERT, Superintendent, Defendant-Appellee.
 No. 98-99028.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 10, 1998.
Decided Oct. 11, 1998.
Amended Oct. 12, 1998.
 
 Bruce Livingston and Joan Fisher, Federal Defenders of Eastern Washington and Idaho, Moscow, ID, Todd Maybrown, Allen, Hansen, Maybrown, Seattle, Washington, Sheryl Gordon McCloud, Seattle, WA, for appellant.
 John Sampson, Olympia, WA, for appellee.
 Appeal from the United States District Court for the Eastern District of Washington; William Fremming Nielsen, Chief District Judge, Presiding. D.C. No. CT-98-00382-WFN.
 Before: REINHARDT, THOMPSON and KLEINFELD, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge.
 
 
 1
 Katie Vargas ("Vargas") appeals the district court's denial of her application for a stay of execution filed on behalf of her son, Jeremy Sagastegui ("Sagastegui"), a Washington state prisoner, who is scheduled to be executed on October 13, 1998. The district court held that Vargas lacked standing as Sagastegui's "next friend" and that the district court therefore lacked jurisdiction to entertain her application. The court dismissed her case, but issued a certificate of appealability to this court.[1]
 
 
 2
 We conclude that Vargas has produced sufficient new evidence pertaining to Sagastegui's alleged incompetence, not considered at the last state court competency hearing two-and-a-half years ago, to support her standing for the purposes of invoking our jurisdiction to issue a stay. Accordingly, we reverse the district court and issue a stay of execution to permit the state court to conduct a hearing to determine Sagastegui's present competency.
 
 I. FACTUAL BACKGROUND
 
 3
 A complete description of Sagastegui's offense and state court proceedings appears in State v. Sagastegui, 135 Wash.2d 67, 954 P.2d 1311 (1998). Sagastegui admitted sodomizing and killing a three-year old boy whom he was babysitting and killing the boy's mother and her friend. He testified he enjoyed the killings, and would have gone to a food court and killed more people had he not been feeling tired.
 
 
 4
 On November 22, 1995, Sagastegui was formally charged with three counts of aggravated murder in the first degree. Prior to trial, Sagastegui underwent a 15-day mental exam at Eastern State Hospital. The examining panel, consisting of a competency therapist, a clinical psychologist, and a psychiatrist, diagnosed Sagastegui as suffering from Alcohol Dependence, Episodic; Polysubstance Abuse; and Antisocial Personality Disorder with Narcissistic Features, but unequivocally concluded he was competent. Based on the examining panel's report, the trial court found Sagastegui competent to stand trial. A jury trial began on January 30, 1996. Sagastegui represented himself, assisted by advisory counsel. At the conclusion of jury selection, Sagastegui pleaded guilty to all three charges of aggravated first degree murder. At the penalty phase, Sagastegui refused to permit the introduction of any mitigating evidence. He was sentenced to death.
 
 
 5
 On March 11, 1996, the trial court considered Sagastegui's request to waive his rights to appeal and to the assistance of counsel for any review of his sentence. The trial court again considered Sagastegui's competence. The trial court questioned Sagastegui orally and reviewed his response to a written questionnaire. The court also considered testimony from mental health professionals who had previously examined Sagastegui at Eastern State Hospital. Ultimately, the trial court entered findings of fact and conclusions of law and expressly found that Sagastegui was mentally competent and able to waive his rights to appeal and to assistance of counsel. The trial court noted that Sagastegui's decision to waive his rights to appeal and to the assistance of counsel was made voluntarily, intelligently, and knowingly.
 
 
 6
 Meanwhile, David G. Grubb, M.D., a psychiatrist for the Washington State Penitentiary ("the Penitentiary"), had conducted a routine mental health evaluation of Sagastegui to determine if Sagastegui needed to continue to be kept in the Penitentiary's mental health ward. Grubb's written evaluation is dated February 21, 1996, but it was not presented to the trial court for that court's consideration at the March 1996 competency hearing. Dr. Grubb observed "no psychosis, thought disorder or paranoia" in Sagastegui. He found Sagastegui's mood inappropriate, but he determined that Sagastegui was generally coherent. He diagnosed Sagastegui as suffering from Probable Bipolar Disorder with depressive episodes; Explosive Disorder, probably related to bipolar disorder; Post-Traumatic Stress Disorder by history; Alcohol Abuse; Bisexual Orientation; and Probable Mixed Personality Disorder. Dr. Grubb stated no opinion about Sagastegui's competence, but concluded he did "not seem to be in need of any medication."
 
 
 7
 On May 8, 1997, Gerry S. Weber, Ph.D., a psychologist for the Penitentiary, interviewed Sagastegui for twenty minutes to assess a request by Sagastegui to live at the Penitentiary's Special Housing Unit. Dr. Weber made no diagnoses and stated no opinion as to Sagastegui's competence. He did conclude that Sagastegui "was oriented and displayed no signs of mental or emotional illness or of impaired contact with reality." Dr. Weber also reported that Sagastegui had committed some "infractions," including an episode where Sagastegui "became angered and tore up his mattress and broke his TV."
 
 
 8
 On April 30, 1998, the Supreme Court of Washington affirmed Sagastegui's sentence of death. State v. Sagastegui, 135 Wash.2d 67, 954 P.2d 1311 (Wash.1998)(en banc).
 
 
 9
 On May 7, 1998, Ronald D. Page, Ph.D., a clinical psychologist for the Penitentiary, evaluated Sagastegui "to assess possible psychosis and suicidal potential" and issued a report. Dr. Page reviewed Sagastegui's file and interviewed him for 30 minutes. He noted that Sagastegui had been prescribed Depakote and Thorazine, which decreased his emotional instability, promoted sedation, and enabled him to sleep 16 hours per day. Dr. Page conducted a standard Mental Status Evaluation on Sagastegui with the following results:
 
 
 10
 This man was unable to subtract serial 7's beyond 93. His interpretation of simple proverbs was difficult to elicit except for a correct abstraction on "look before you leap." Mr. Sagastegui seemed alert, well oriented, and attentive. His self report was satisfactorily well organized. Memory for recent and remote events was rather imprecise or general. Mood was positive, with congruent affect. Speech content appeared lucid, without apparent thought disorder. Mr. Sagastegui denied suicidal/assaultive ideation claiming, "that would be kind of silly since the State's going to do it for me." Insight may be partial and judgment highly questionable.
 
 
 11
 Dr. Page diagnosed Sagastegui as suffering from Atypical Psychosis, now in remission; Alcohol Abuse, now in remission; and Personality Disorder NOS. He determined Sagastegui's Global Assessment of Functioning ("GAF") score to be 55.[2] Dr. Page concluded that Sagastegui's "current psychotropic regime" should be continued because he could be emotionally unstable if deprived of his medication and stated that he "reportedly decompensates to near psychosis without psychotropics, hence he is at risk of decompensation at anytime when medication may be refused or discontinued." Dr. Page offered no opinion as to Sagastegui's competence. Dr. Page concluded his report by noting that a prognosis was "a moot issue considering [Sagastegui's] pending death sentence. For the remainder of his lifetime I find no reason to expect significant change from his current fragile/tenuous reality contact and ongoing potential for regression to atypical psychosis."
 
 
 12
 In a report dated September 22, 1998, A. Steven Frankel, Ph.D., J.D., a clinical psychologist specializing in the diagnosis and treatment of Dissociative Identity Disorder ("DID"), indicated he had reviewed the reports of the mental health experts who had examined Sagastegui and testified at the state court's March 11, 1996 hearing. Dr. Frankel stated that DID, which was formerly known as Multiple Personality Disorder, is a difficult disorder to diagnose and that the possibility that Sagastegui suffers from DID "has apparently not even been addressed, much less ruled out." He opined that many of the observations in Sagastegui's prior competency reports "could reflect the presence of DID." Dr. Frankel strongly recommended a full and complete evaluation of Sagastegui to rule out the possibility that he suffers from DID.
 
 
 13
 On September 23, 1998, Katie Vargas, Sagastegui's mother, filed a motion in the Washington Supreme Court to participate as her son's next friend, and to file a personal restraint petition on his behalf.
 
 
 14
 On September 26, 1998, G. Christian Harris, M.D., reviewed Sagastegui's file and interviewed him for two hours at the request of the State of Washington's Attorney General's Office. Dr. Harris did not conduct a Mental Status Exam or any other psychological testing. In a report dated September 28, 1998, Dr. Harris diagnosed Sagastegui as suffering from only an Antisocial Personality. Dr. Harris detected some signs of depression but concluded "this depression is related to his lifestyle." Dr. Harris found "no evidence that [Sagastegui's] mental disorders are impacting his decision making in the legal processes involved in his pleading guilty and his decision to not appeal his death sentence." Dr. Harris noted:
 
 
 15
 Some might question [my finding that Sagastegui is competent and suffers from no mental disorder that is interfering with his ability to evaluate his situation and make appropriate decisions] from the standpoint that there is evidence in the record that this man wanted to die for years and some might speculate that he has committed these terrible crimes and pled guilty to them with hopes that the state's capital punishment statute will take the matter of his life and death out of his hands. My opinion regarding this possibility is that it remains a moot point. I do not consider that wanting to die is necessarily evidence that a person is demented or that a "mental disorder" is necessarily causing the individual to wish for death.
 
 
 16
 Dr. Harris supplemented his report with a letter on September 29, 1998 in which he expressed his disagreement with "many of the past diagnoses" of Sagastegui, particularly those by Dr. Grubb and Dr. Page. He categorically stated: there is no evidence Sagastegui has ever suffered from depression except as related to his lifestyle; there is no phenomenological data to support a diagnosis of Post-Traumatic Stress Disorder; and Sagastegui has never decompensated or been near psychosis. Dr. Harris also denied the existence of Dissociative Identity Disorder and that Sagastegui might suffer from such an illness.
 
 
 17
 On October 1, 1998, without holding an evidentiary hearing, the Washington Supreme Court denied Vargas's motions without comment.
 
 
 18
 On October 5, 1998, Vargas filed a motion in the United States District Court for the Eastern District of Washington to act as Sagastegui's next friend. Vargas submitted the same evidence she had previously submitted to the Washington Supreme Court; the State also submitted the same contrary evidence it had previously submitted. Sagastegui filed a Declaration on October 6, 1998, stating his opposition to his mother's motion to act as a next friend. The district court, after reading the file and briefs, held a hearing on October 7, 1998. It did not, however, take any testimony. The court concluded that Vargas failed to present meaningful evidence to support her claim of standing. Thus, the court held it lacked jurisdiction to act on her Motion for Stay of Execution. Nonetheless, the court determined that Vargas had made a substantial showing of the denial of a constitutional right with regard to the court's jurisdiction. Pursuant to 29 U.S.C. § 2253, the court issued a certificate of appealability. This appeal followed.
 
 
 19
 II. THE STANDARD OF REVIEW FOR DETERMINATIONS OF STANDING TO INVOKE THE JURISDICTION OF A FEDERAL COURT TO ISSUE A STAY
 
 
 20
 A. STANDARDS FOR GRANTING A STAY.
 
 
 21
 Under 28 U.S.C. § 2251, a federal court is authorized to enter a stay of execution pending review of any habeas corpus proceeding. In Barefoot v. Estelle, 463 U.S. 880, 895, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), the Supreme Court set out the proper standard for granting a stay of execution: "[t]he granting of a stay should reflect the presence of substantial grounds upon which relief might be granted." The Court added:
 
 
 22
 In requiring a 'question of some substance', or a 'substantial showing of the denial of [a] federal right,' obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'
 
 
 23
 Id. at 893, n. 4, 103 S.Ct. 3383 (citations omitted) (emphasis added).
 
 
 24
 Finally, the Court explained that essentially the same standard exists for a stay pending a writ of certiorari to the Court following the denial of a writ of habeas corpus by a court of appeals:
 
 
 25
 there must be a reasonable probability that four members of the Court would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction; there must be a significant possibility of reversal of the lower court's decision; and there must be a likelihood that irreparable harm will result if that decision is not stayed.
 
 
 26
 Id. at 895-96, 103 S.Ct. 3383 (citations omitted). See also Maggio v. Williams, 464 U.S. 46, 104 S.Ct. 311, 78 L.Ed.2d 43 (1983)(applying the standard for granting of a stay pending disposition for certiorari to determining whether a stay granted by a court of appeals should stay in effect).
 
 
 27
 B. THE REQUIREMENTS FOR "NEXT FRIEND" STANDING.
 
 
 28
 Under Article III, a federal court cannot consider the merits of a legal claim unless the person seeking to invoke the jurisdiction of the court establishes the requisite standing to sue. Whitmore v. Arkansas, 495 U.S. 149, 154, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). A litigant demonstrates standing by showing that she has suffered an injury in fact that is fairly traceable to the challenged action and is redressable by a favorable judicial decision. Steel Company v. Citizens for a Better Environment, 523 U.S. 83, ----, 118 S.Ct. 1003, 1017, 140 L.Ed.2d 210 (1998).
 
 
 29
 The Supreme Court recognized in Whitmore that a habeas petitioner may demonstrate standing as a "next friend." 495 U.S. at 163, 110 S.Ct. 1717. A next friend does not herself become a party to the habeas petition, "but simply pursues the cause on behalf of the detained person, who remains the real party in interest." Id. The Court set out "at least two firmly rooted prerequisites to 'next friend' standing":
 
 
 30
 First, a next friend must provide an adequate explanation--such as inaccessibility, mental incompetence, or other disability--why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the next friend must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate and it has been further suggested that a next friend must have some significant relationship with the real party in interest. The burden is on the next friend clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.
 
 
 31
 Id. at 163-64, 110 S.Ct. 1717 (citations omitted).
 
 
 32
 Thus, in order to meet the first prong of next friend standing, Vargas must show that Sagastegui is "unable to litigate his own cause due to mental capacity." Id. at 165, 110 S.Ct. 1717. The Supreme Court stated the test for determining whether a habeas petitioner is competent to waive his right to federal review of his conviction in Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966):
 
 
 33
 whether he has [the] capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity ...
 
 
 34
 In Whitmore, the Court concluded that Whitmore, the putative next friend, lacked standing because he failed to present "meaningful evidence" that the real party in interest was incompetent. 495 U.S. at 165-66, 110 S.Ct. 1717.
 
 
 35
 In Demosthenes v. Baal, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990), the Court granted a motion to vacate a stay because this court was without jurisdiction to entertain a next friend petition. The Court first observed that the state courts had found that Baal, the real party in interest, was competent and that the district court had properly denied the petitioners' motion for an evidentiary hearing because they had not presented " 'meaningful evidence' of incompetency." 495 U.S. at 736, 110 S.Ct. 2223 (citing Whitmore, 495 U.S. at 166, 110 S.Ct. 1717). The Court then held:
 
 
 36
 As there was no evidentiary basis for the Court of Appeals' conclusion that the District Court erred in declining to conduct an evidentiary hearing, the stay granted by the court did not "reflect the presence of substantial grounds upon which relief might be granted." ... [F]ederal courts are authorized by the federal habeas statutes to interfere with the course of state proceedings only in specified circumstances. Before granting a stay, therefore, federal courts must make certain that an adequate basis exists for the exercise of federal power. In this case, that basis was plainly lacking.
 
 
 37
 Id. at 737, 110 S.Ct. 1717 (emphasis added).
 
 
 38
 In Brewer v. Lewis, 989 F.2d 1021 (1993), this court denied a stay of execution sought by a mother claiming next friend standing. We determined that because Ms. Brewer had not presented the " 'meaningful evidence' necessary to support [her] claim of standing," she was not entitled to an evidentiary hearing on her son's competence. Brewer, 989 F.2d at 1025-1026 (citing Baal, 495 U.S. at 736, 110 S.Ct. 2223). For the same reason, i.e. the absence of "meaningful evidence that [the condemned prisoner] was suffering from a mental disease, disorder or defect that substantially affected his capacity to make an intelligent decision," we also dismissed her appeal for lack of standing. Id. at 1026 (citing Whitmore, 495 U.S. at 166, 110 S.Ct. 1717).
 
 
 39
 C. THE QUANTUM OF PROOF OF INCOMPETENCE REQUIRED FOR A NEXT FRIEND TO REQUEST A STAY.
 
 
 40
 The State urges us to dismiss Vargas's motion for lack of jurisdiction because she has not "clearly established" that Sagastegui is incompetent. Vargas, on the other hand, contends that because the district court issued a certificate of probable cause based on a "substantial showing" as to jurisdiction, we must grant an automatic stay pending resolution of her petition on the merits. Neither party correctly states the standard we must apply in determining whether we have jurisdiction to grant a stay of execution to a "next friend."
 
 
 41
 We conclude that our jurisdiction must be based on essentially the same quantum of evidence whether measured by the Barefoot standard for grant of a stay, by the Whitmore standard for next party standing, or by the juxtaposition of the two standards. If Vargas has produced meaningful new[3] evidence that Sagastegui is not competent, she has established her standing to request a stay. Whitmore, 495 U.S. at 164-166, 110 S.Ct. 1717; Baal, 495 U.S. at 736-737, 110 S.Ct. 2223. The same quantum of evidence constitutes a "substantial showing ... [that] demonstrates the [issue of jurisdiction is] debatable among jurists of reason," Barefoot, 463 U.S. at 893 n. 4, 103 S.Ct. 3383, and raises "a reasonable probability that four members of the Court would consider ... the notation of probable jurisdiction," id. at 895, 103 S.Ct. 3383.
 
 
 42
 No authority requires that this court determine on the merits that Sagastegui is not competent before we can grant a stay of execution in order to allow the state to conduct an evidentiary hearing to determine if he is competent. If this were true, there would be no difference between Vargas's ultimate burden of clearly establishing that Sagastegui is incompetent and the requirement that she produce meaningful evidence that he is incompetent to establish her standing to obtain a stay of execution pending a hearing to determine that issue.
 
 
 43
 The quantum of evidence supporting Vargas's standing and, therefore, jurisdiction of this court to exercise federal authority is logically connected to the degree of authority we are asked to exercise. Here, we are not reviewing a habeas petition. We are merely resolving whether or not we have jurisdiction to grant a stay of execution until an evidentiary hearing can be held as to Sagastegui's competence. For this limited purpose, we conclude Vargas has standing.
 
 
 44
 III. VARGAS PRESENTS SUFFICIENT EVIDENCE OF HER STANDING TO REQUEST A STAY
 
 
 45
 As discussed above, Vargas's standing depends on a showing by a sufficient quantum of evidence (1) that she is truly dedicated to the best interests of Sagastegui and (2) he is not competent to make the decision whether or not to pursue a habeas petition.
 
 
 46
 A. VARGAS HAS SHOWN THAT SHE REPRESENTS SAGASTEGUI'S BEST INTERESTS.
 
 
 47
 Vargas easily meets the best interests requirement. There is essentially a per se rule that a parent meets this prong of the next friend standing test. See, e.g., Hamilton v. Texas, 485 U.S. 1042, 108 S.Ct. 1761, 100 L.Ed.2d 187 (1988)(mother); Evans v. Bennett, 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979)(Rehnquist, J., Circuit Justice)(mother); Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976)(mother); Brewer v. Lewis, 989 F.2d 1021 (9th Cir.1993)(mother). We also note that other members of Sagastegui's family and loved ones appear to support Vargas's petition.
 
 
 48
 Although Sagastegui insists it is in his best interests to be executed, crediting his position begs the question of his competence. If Sagastegui is not competent to rationally determine his best interests, his viewpoint is not determinative. Moreover, we reject the contention that, simply because a condemned prisoner wants to be executed, it is not even "debatable among reasonable jurists" whether an otherwise qualified next friend represents the prisoner's best interests. To accept that proposition would almost categorically eliminate next friend petitions.
 
 
 49
 B. SAGASTEGUI WAS COMPETENT PRIOR TO AND ON MARCH 11, 1996.
 
 
 50
 The Supreme Court has held that the prerequisite showing of the real party in interest's incompetence "is not satisfied 'where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed.' " Baal, 495 U.S. at 734, 110 S.Ct. 2223. A state court's determination regarding a defendant's competency is entitled to a presumption of correctness on federal habeas review. Id. at 735, 110 S.Ct. 2223. A federal court may not overturn such determinations unless their correctness is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).
 
 
 51
 The trial court twice determined that Sagastegui was competent--most recently following the hearing held on March 11, 1996. The Washington Supreme Court explicitly affirmed those findings. Unless those findings are rebutted, we cannot conclude that Sagastegui was incompetent on or before March 11, 1996. Moreover, those findings are extremely well supported by expert opinions, psychological testing, and Sagastegui's courtroom demeanor.
 
 
 52
 Vargas's challenges to the state trial court's findings at the March 1996 hearing rest on: (1) affidavits from laypersons who know Sagastegui that suggest he is mentally ill and suffers from multiple personalities, (2) evidence that Sagastegui prevented a full and fair hearing about his competence by concealing his mental illness, (3) the existence of medical reports about Sagastegui's competence that were not presented to the trial court, and (4) the affidavit of Dr. Frankel that suggests Sagastegui might suffer from a mental illness that prior experts failed to rule out.
 
 
 53
 None of the evidence presented by Vargas clearly and convincingly rebuts the state court's findings based on its March 1996 hearing. The lay affidavits do present assertions that the examining experts and the trial court would undoubtedly have found helpful in assessing Sagastegui's competence. Many of these possibilities were, however, known to the experts who determined Sagastegui was nonetheless competent at that time. Vargas presents nothing to suggest that, even in the absence of the trial court's findings, this evidence would establish Sagastegui's incompetence. Dr. Frankel's report is conclusory, is not based on an examination of Sagastegui, and merely suggests the possibility that Sagastegui suffers from an undiagnosed mental illness which might render him incompetent.
 
 
 54
 Vargas's challenge to the fullness and fairness of the trial court hearings also fails. Although we do not rule out the possibility that a defendant's deception could undermine a trial court's finding of competence, Vargas's assertions are not sufficient to support such a holding here. Many of the experts who have examined Sagastegui have recognized that he is unreliable and/or deceitful during examinations. We decline, therefore, to conclude that all of the experts and the trial court were fooled into believing Sagastegui is competent because he lied to them in order to further a grand suicidal scheme.
 
 
 55
 Vargas does raise a troubling question about the possible withholding of relevant information from the trial court and examiners by the State. This is fairly speculative, however. The only report that Vargas is certain exists and was available to the State at the time of the trial court's hearing, but was not presented, is Dr. Grubb's report. The State states that it did not present that report to the trial court because Sagastegui exercised his privilege to prevent disclosure of the report. Given the overwhelming evidence of competence presented to the trial court, however, it is unlikely that Dr. Grubb's report would have changed the court's findings. We conclude Vargas has not rebutted the presumption of the correctness of the state court's findings from the March 1996 hearing.
 
 
 56
 C. MEANINGFUL NEW EVIDENCE THAT SAGASTEGUI IS NOT CURRENTLY COMPETENT.
 
 
 57
 1. THERE IS NO STATE FINDING OF SAGASTEGUI'S CURRENT COMPETENCE THAT IS PRESUMPTIVELY CORRECT.
 
 
 58
 The state trial court last found Sagastegui mentally competent following its March 11, 1996 hearing. Other than the determination following that hearing held over two-and-a-half years ago, no express judicial finding regarding Sagastegui's mental state has been made by any court. In its April 30, 1998 opinion affirming Sagastegui's sentence of death, the Washington Supreme Court limited its consideration to the correctness of the trial court's determinations and therefore only reviewed Sagastegui's past competence. Sagastegui, 954 P.2d at 1321-22. Subsequently, in its October 1, 1998 denial of Vargas's motion to participate as a next friend, the Washington Supreme Court made no findings, written or oral, as to Sagastegui's mental competency. The court held no hearing and denied Vargas's motion without comment. Although the court may have implicitly concluded that Sagastegui is currently competent, we have been presented with neither evidence to that effect nor authority to support presuming the correctness of such an implication.[4]
 
 
 59
 An implied finding of a state appellate court that has not conducted an evidentiary hearing does not rise to the level of the state findings presumed correct in Whitmore, Baal, and Brewer. In Whitmore, the state trial court had conducted two full evidentiary hearings within the preceding two years, both of which were reviewed and affirmed by the state supreme court. 495 U.S. at 151-53, 110 S.Ct. 1717. The next friend petitioner initiated the federal habeas proceedings only three days after the last state supreme court decision. Id. at 153, 110 S.Ct. 1717. The next friend petitioner offered no evidence challenging the state court findings or demonstrating a change in the defendant's condition since the findings were made. Id. at 165-166, 110 S.Ct. 1717.
 
 
 60
 In Baal, the Supreme Court relied on findings made by the state court after a hearing held one week before the petitioners brought their federal petition. 495 U.S. at 732-33, 110 S.Ct. 2223. The state court expressly found that Baal was competent and had intelligently waived his right to pursue postconviction relief. Id. at 733, 110 S.Ct. 2223. The only new evidence introduced by the petitioners was the affidavit of a psychiatrist who had never examined Baal. Id. at 733-34, 110 S.Ct. 2223. Moreover, the psychiatrist's affidavit merely asserted that "there is reason to believe" that Baal was not competent. Id. at 735-36, 110 S.Ct. 2223. The district court concluded, and the Supreme Court agreed, that the affidavit was "conclusory and lacking sufficient foundation or substance." Id. at 736, 110 S.Ct. 2223.
 
 
 61
 In Brewer, the trial court had held two full hearings as to Brewer's competence. 989 F.2d at 1022-24. In 1988, the court held a hearing to determine whether Brewer was competent to plead guilty. Id. at 1023. At this hearing the trial judge questioned Brewer and examined the reports of two psychiatrists. Id. The trial court expressly found Brewer competent and accepted his plea. Id. In November 1992, Brewer moved to dismiss his automatic post-conviction review. Id. The trial court held another hearing at which the judge questioned Brewer and determined that he was competent before granting Brewer's motion. Id. at 1024. Elsie Brewer, the defendant's mother, then filed her petition as Brewer's next friend. Id. In February, 1993, the district court concluded after a hearing that Elsie Brewer lacked standing. Id.
 
 
 62
 Only four months had passed between the full evidentiary hearing held by the state court and the review of Brewer's petition by the federal district court. Moreover, the contrast between the evidence before the Brewer court and the evidence Vargas presents here is striking. In Brewer we stated:
 
 
 63
 Here, petitioner has submitted brief affidavits of two doctors who have never met Brewer as well as an affidavit of Dr. Bayless, who examined Brewer and found him competent in 1988. Dr. Bayless speculates, based on information not available to him at that time, that Brewer's mental condition may have deteriorated during his incarceration, and that Brewer may now suffer from a major depressive disorder. As in Baal, this conclusory evidence is insufficient to outweigh the substantial evidence in the record demonstrating the defendant's competence. Within the last two and one-half months, no less than four psychological experts have personally examined and tested Brewer and found him competent.
 
 
 64
 Id. at 1026.
 
 
 65
 2. VARGAS HAS PRESENTED NEW MEANINGFUL EVIDENCE THAT SAGASTEGUI'S MENTAL CONDITION HAS DETERIORATED.
 
 
 66
 Vargas presents meaningful evidence that Sagastegui's mental condition has deteriorated since March 11, 1996. This evidence tends to prove that Sagastegui now suffers from mental illnesses that were not diagnosed at the time of the state court's findings, that he now requires medication he did not previously require, and that these illnesses and medications may substantially affect his present competency.
 
 
 67
 Conflicting testimony among Sagastegui's examiners since the last judicial finding of competency creates, rather than precludes, a substantial issue as to Sagastegui's current competency. On May 7, 1998, Dr. Page diagnosed Sagastegui as suffering from atypical psychosis and stated that Sagastegui could degenerate if taken off his current psychotropic regime of Thorazine and Depakote. Thorazine is a psychotropic drug with sedative effects and is indicated for management of manifestations of psychotic disorders, severe behavioral problems, and the manifestations of the manic type of bipolar illness. See Physician's Desk Reference 2116 (44th ed.1990). Depakote is an antiepiletic drug indicated for use as sole and adjunctive therapy in the treatment of simple (petit mal) and complex absence seizures. Id. at 515. Depakote may produce central nervous system depression and has sedative effects. Id. at 516. True, Dr. Harris, after examining Sagastegui on September 26, 1998, rejected any diagnosis of psychosis and concluded there was no evidence of decompensation by Sagastegui. Dr. Harris fails to explain, however, why Sagastegui is currently being prescribed doses of Thorazine and Depakote that make him sleep sixteen hours per day if he suffers from only an antisocial personality disorder. Moreover, Dr. Frankel's opinion tends to corroborate Dr. Page's conclusions and rebuts Dr. Harris's.
 
 
 68
 The State argues that Dr. Page could be correct that Sagastegui suffers from psychosis, but Sagastegui could still be competent. This is true. However, there is no evidence to support such a conclusion. Dr. Harris found Sagastegui competent, but based on the premise that he was not psychotic, not that he was psychotic but competent. Further, if Sagastegui suffers from psychosis and has a fragile grip on reality, as Dr. Page concludes, then he definitely suffers "from a mental disease, disorder, or defect which may substantially affect his capacity." Rees, 384 U.S. at 314, 86 S.Ct. 1505 (emphasis added). This is undeniably meaningful evidence that Sagastegui is not competent. Again, as we stated earlier, the evidence presented by Vargas is new and meaningful when compared to the evidence in Whitmore, Baal, and Brewer.
 
 
 69
 Although we must accept the state court finding that Sagastegui was competent on and before March 11, 1996, the evidence Vargas presents from Dr. Grubb and from laypersons corroborates the new evidence of his current incompetence. This evidence strengthens Vargas's position in at least three relevant respects: (1) it helps to rebut Dr. Harris's conclusions; (2), without denying Sagastegui's earlier period of competence, it tends to prove that Sagastegui has had prior periods of more serious mental disease; and (3) it corroborates Dr. Page's findings of current serious mental illness. Moreover, the evidence alleging that Sagastegui has a suicidal wish to die seems at least partially linked to his psychosis, indicating that by reason of his mental illness he may not be capable of making "a rational choice with respect to continuing or abandoning further litigation." Rees, 384 U.S. at 314, 86 S.Ct. 1505.
 
 
 70
 IV. VARGAS'S OTHER ARGUMENTS FOR HER STANDING
 
 
 71
 Because we conclude Vargas has made the necessary threshold showing of standing to support this court's jurisdiction to issue a stay of Sagastegui's execution, we do not consider her remaining arguments in support of standing.
 
 V. CONCLUSION
 
 72
 Vargas has raised a substantial question as to Sagastegui's present competency by presenting new and meaningful evidence that Sagastegui's mental state has deteriorated since the last state competency hearing two-and-a-half years ago. If Sagastegui is presently incompetent, then Vargas will have standing to file habeas proceedings as his next friend; otherwise she will not. She has, however, met her burden at this stage of the proceedings by presenting sufficient new and meaningful evidence of Sagastegui's present incompetence to support this court's jurisdiction to issue a stay of execution to permit the state court to conduct a current competency hearing.
 
 
 73
 Accordingly, we reverse the district court's dismissal of Vargas's application for a stay of Sagastegui's execution, and issue a stay of execution to permit the state court to conduct a hearing to determine Sagastegui's present competency.
 
 
 74
 IT IS SO ORDERED.
 
 
 75
 KLEINFELD, Circuit Judge, dissenting.
 
 
 76
 Sagastegui was determined to be competent to make his own decisions in his case after extensive psychiatric examination and judicial proceedings in the State of Washington courts in 1996, affirmed by the Supreme Court of Washington this April. State v. Sagastegui, 135 Wash.2d 67, 954 P.2d 1311 (Wash.1998). Now we face last minute papers[1] to stay execution and enable Sagastegui's mother to take over his defense. To succeed, she must show entitlement to act as "next friend," that is, to take away from him control of his case. Because his competence to manage his case has been conclusively established, she must show that there is something new, some new reason why, because of his mental condition, he cannot competently decide how to proceed. There is nothing new of any significance.
 
 
 77
 Obviously Sagastegui is not a normal, healthy individual. A normal, healthy person would not rape, stab and drown a three year old boy, lie in wait for his mother, shoot her dead when she came home, and then shoot her friend and as she lay dying, tell her "hurry up and die." That is what Sagastegui did. But there is no legal significance to whether Sagastegui is mentally normal. What matters, all that matters to the case before us, is whether his mental abnormalities render him incompetent to make the critical decisions in his case. There is no evidence, new or old, that they do.
 
 
 78
 Sagastegui has, from the time he got caught, known and clearly articulated exactly what he wants--to allow his execution to proceed. He insisted on representing himself, and rejected appointed counsel. The state commission that examined Sagastegui's competency reported that he wanted to "override defense counsel's plan to fight the death penalty by the prosecution with activists' testimony from Seattle." He has filed two sworn affidavits in the past few weeks, September 25 and October 6, saying, "[i]t is my desire that my execution scheduled for October 13, 1998, not be delayed." He has been carefully examined by numerous physicians and psychologists to determine whether his choice to allow his execution to proceed is itself evidence that he is mentally incompetent to make that decision. The state competency commission reported that "his request is not due to a desire to die, or a desire to be punished in the extreme, but rather that life imprisonment was more severe to him."
 
 
 79
 The Supreme Court has set out precisely what must be established for one person to take over another's case as "next friend." Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) is the first in a line of cases uniformly denying next friend standing to persons seeking to prevent execution of inmates who wanted to allow their executions to proceed. Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), established "two firmly rooted prerequisites for 'next friend' standing:
 
 
 80
 First, a "next friend" must provide an adequate explanation-such as inaccessibility, mental incompetence, or other disability-why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest."
 
 
 81
 Whitmore, 495 U.S. at 163-64, 110 S.Ct. 1717. "The burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." Id. at 164, 110 S.Ct. 1717.
 
 
 82
 [O]ne necessary condition for "next friend" standing in federal court is a showing by the proposed "next friend" that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability.
 
 
 83
 That prerequisite for "next friend" standing is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded.
 
 
 84
 Id. at 165, 110 S.Ct. 1717.
 
 
 85
 Demosthenes v. Baal, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam), vacated a stay we had granted, where the prisoner wanted his execution to proceed, and his parents filed last minute next friend papers to obtain a stay. We had held that the parents had made "some minimum showing of incompetence" and that evidence in the record provided "at least an arguable basis for finding that a full evidentiary hearing on competence should have been held by the district court." The Court reversed our decision, because the state court determination of competency could not be overturned unless it was not fairly supported by the record. It was, so a federal court was bound by the state finding under 28 U.S.C. § 2254(d). Despite a new psychiatric affidavit asserting "reason to believe this person may not be competent," the Supreme Court held that the district court had been correct in denying an evidentiary hearing, because the psychiatrist's affidavit was not " 'meaningful evidence' of incompetency" sufficient under Whitmore. Id. at 736, 110 S.Ct. 2223.
 
 
 86
 Subsequently in Brewer v. Lewis, 989 F.2d 1021 (9th Cir.1993), we held that a condemned prisoner's mother was not entitled to an evidentiary hearing on her "next friend" proceeding, despite two new doctors' affidavits asserting incompetence, because the affidavits did not amount to "meaningful evidence" under Demosthenes and Whitmore. The doctors had not personally met the prisoner, and substantial medical evidence in the record from those who had examined him showed that, despite his personality disorder and strange notions of dead people being on another planet, he was competent.
 
 
 87
 In Wells v. Arave, 18 F.3d 656 (9th Cir.1994), we denied a certificate of probable cause for an appeal of denial of "next friend" status. Wells was a diagnosed schizophrenic with active delusions. He had been determined to be competent anyway, and the family's new affidavits about his delusions were held not to be "meaningful evidence" under Demosthenes and Whitmore. No evidentiary hearing was required, despite this new evidence, and despite absence of cross examination of the physicians whose reports had been the basis for the state determination of competence.
 
 
 88
 I do not think this case can be distinguished from this extensive line of authority going the other way. There is persuasive evidence that Sagastegui is not mentally sound, but there is no evidence "meaningful" under the Demosthenes and Whitmore standard that he was or is incompetent by reason of that unsoundness to decide not to challenge his execution. The state court was concerned that Sagastegui might have a mental disorder that might affect his competence, subjected him to extensive psychiatric and psychological testing to find out, and concluded after extensive evidentiary proceedings that he did not.
 
 
 89
 The majority errs in failing properly to apply controlling precedent because of an implicit presupposition that one must either be mentally healthy or altogether non-functional. Mental illness is not binary, such that either one is entirely healthy, or so insane that he can do nothing; it is a continuum, like physical illness, and one can be mentally quite ill yet competent in some respects. And like physical illness, mental illness may disable a person for some functions but not others. Everyone involved in Sagastegui's case has, from the beginning, recognized that there is something wrong with the man. But the possibility that the things wrong with his mind disable him from deciding how to proceed in his case has been decisively refuted by overwhelming evidence.
 
 
 90
 It was striking, as I read the transcripts of the extensive proceedings in which Sagastegui participated, just how competent he was. He insisted on representing himself, because, as he explained, he wanted to control his defense to prevent his lawyer from bringing in "anti-death penalty advocates from Seattle." He was given stand-by counsel to assist him, and he used standby counsel effectively and consulted frequently. He spoke appropriately, objected carefully and effectively to matters he wanted out, and made his positions and the reasons for them clear. His precision in making a limited waiver of his medical privilege, to allow access to some but not all of his medical history, showed his ability to conduct his own litigation.
 
 
 91
 At the preliminary hearing on November 21, 1995, Sagastegui expressed his desire to represent himself but the presiding judge appointed counsel anyway. When Sagastegui renewed his request for self-representation at his December 1 arraignment, the court expressed concern but allowed him to represent himself and made his counsel "stand-by" counsel instead. At hearings on December 15 and 18, the judge inquired again about his waiver of counsel and asked him numerous questions before determining that the waiver was knowing, voluntary, and intelligent.
 
 
 92
 On December 29, 1995, the state superior court judge referred Sagastegui for a 15 day evaluation at Eastern State Hospital before allowing him to represent himself and enter a plea. The hospital's "sanity commission" determined that Sagastegui was competent to stand trial and noted in its report that Sagastegui said that "[h]e would rather be dead he thinks than spend his whole life in an 8x10 cell in prison." He was acting "in a manner he believes is in his best interest." In the discharge summary, Dr. Cressy noted that Sagastegui showed "no evidence whatsoever of any mental disorder of the nature of schizophrenia or bipolar disorder ... his major diagnosis appeared to be a marked antisocial personality disorder with narcissistic features ... we saw no evidence of depression." In its letter to the judge, the "sanity commission" echoed that there was "no current evidence of thought or mood disorder or other major illness. Mr. Sagastegui is clear and cogent in thinking, oriented in all spheres and goal directed in behavior." The commission noted that he had explained his waiver of counsel "in terms of wanting 'total control' over decisions in his defense." Charles McIlroy, a psychologist on the "sanity commission" also noted that there was no evidence of any major mental illness but was a "sociopathic individual who shows no remorse for the death of three people ... [who] freely admits that he enjoys killing and remains at extreme risk for further acts of violence ... he fully fits the diagnosis of antisocial personality disorder which I see as his primary diagnosis." There is not much more significance to diagnoses of sociopathy or antisocial personality disorder than that the individual is an extraordinarily bad person, without conscience, empathy or remorse, ready to do the most horrible things to others for the slightest benefit to himself.
 
 
 93
 After the "sanity commission" issued its report, the case proceeded to trial on January 30, 1996. Sagastegui attempted to plead guilty to all three charges of aggravated first degree murder. A second state judge went over his statements on his guilty plea before accepting the plea. The penalty phase of the trial began on February 5, 1996 and Sagastegui told the jury that he was not going to present mitigating evidence and that he committed the murders and said, "I liked it. I enjoyed it." The judge conducted a conference in chambers to ensure that he understood that he had the right to present mitigating evidence to the jury. Sagastegui was then sentenced to death.
 
 
 94
 On March 11, 1996, the trial court held a hearing on Sagastegui's request to waive his rights to a general appeal and to the assistance of counsel for any review of his sentence. The trial judge required Sagastegui to answer a seven page questionnaire to ensure that he fully understood the consequences of his decision and then questioned him thoroughly about his answers to each written question. Sagastegui even discussed the possibility of giving a limited waiver of his medical records and the scope of the waiver he was willing to make (he limited it to disclosing the medications that he was currently using). The transcript of the hearing shows that Sagastegui was cogent, interactive with the court, and understood what was occurring. He rephrased questions posed to him to be sure he understood what was being asked, he asked people to repeat things he missed the first time, he went off record a few times to confer with stand-by counsel, and he asked the court reporter if she could "pick up nods." When asked by the court to explain why he didn't want counsel, in his own words, Sagastegui said:
 
 
 95
 other than the fact that it's a right of mine, umm, a lawyer would have a separate and different agenda and goal from what I'm trying to accomplish ... with me giving up the attorney and with me giving up the direct appeal and the fact that I want to go through this as fast as possible ... having a lawyer and going through the direct appeal wouldn't change any way that I would want to run this thing, my appeal. So, I would really appreciate it if I wasn't forced to have an attorney and wasn't forced to go through the direct appeal.
 
 
 96
 Over the objection of Sagastegui that the witnesses were not competent to render an expert opinion, the sentencing court heard the testimony of all three members of the "sanity commission" who had evaluated Sagastegui for 15 days and determined that he was competent. One of the members testified that Sagastegui told her that he wanted the death penalty because he "did not under any circumstances want to be locked up for the rest of his life." Dr. Cressy testified that Sagastegui was capable of rational decision-making regarding the death penalty and noted that Sagastegui's decision "made good sense to me. In fact, I agreed with him. I would do the same thing."
 
 
 97
 At the same hearing, Sagastegui also objected to referring to the commission as the "sanity commission" as this was a competency hearing, not a sanity hearing, and he objected to the presentation of more than one of the members of the commission as cumulative and beyond the scope of his waiver of confidentiality. He also argued that evidence of abuse while he was a child did not matter because of the scope of the Supreme Court review that would be made. In response to the testimony that Sagastegui suffered no mental illness and observation of his interaction with the court, the state court judge found him to be competent and to have made a knowing, voluntary, and intelligent waiver of his rights. The judge also found that Sagastegui was capable of rational decision-making and that his decision seeking the death penalty was not a suicidal desire.
 
 
 98
 On April 30, 1998, the Supreme Court of Washington reviewed the trial court record and sealed psychological reports and also determined that Sagastegui made a knowing, voluntary, and intelligent waiver. State v. Sagastegui, 135 Wash.2d 67, 954 P.2d 1311 (Wash.1998). Under 28 U.S.C. § 2254, we must defer to these factual findings as presumptively correct unless Vargas can rebut "the presumption of correctness by clear and convincing evidence." See also, Demosthenes, 495 U.S. at 734, 110 S.Ct. 2223.
 
 
 99
 The district court, and we, have gone through the record with great care in this case and I cannot see any meaningful evidence that would rebut the presumption of correctness. The only medical evidence that is new that supports Vargas' motions is the declaration of Professor Steven Frankel, Ph.D., J.D., an expert on "dissociative identity disorder." The other new evidence persuasively undermines the claim of incompetency. Dr. Frankel has never met Sagastegui. Dr. Frankel says, based on his reading a report of observations prepared by the Washington Department of Social and Health Service, that Sagastegui "could" have "dissociative identity disorder." This is not meaningful evidence for three reasons: like the doctor in Brewer, Dr. Frankel never actually examined Sagastegui; Dr. Frankel says Sagastegui "could" have "dissociative identity disorder," not that he does; and, Dr. Frankel does not say that Sagastegui would be incompetent to proceed in his litigation, even if he does have such a disorder.
 
 
 100
 Appellant also argues that the psychiatric evaluation of Dr. David Grubb is meaningful evidence that Sagastegui is legally incompetent. Dr. Grubb evaluated Sagastegui prior to the state court competency hearing. Dr. Grubb gave as his impression that Sagastegui probably had bipolar disorder, but as of the time he examined him, Sagastegui "shows no psychosis, thought disorder, or paranoia ... would not seem to be in need of any medication." Dr. Grubb was performing an initial mental health unit evaluation for the prison system, not evaluating Sagastegui for legal competency. All Dr. Grubb observed wrong with Sagastegui when he examined him was an inappropriate degree of "ironic cheerfulness." Nowhere does Dr. Grubb suggest that Sagastegui was legally incompetent.
 
 
 101
 Appellant also argues that the May 8, 1997 report of psychologist Gerry Weber and the May 7, 1998 report of psychologist Ronald Page support her claim that Sagastegui is incompetent. Dr. Weber's evaluation had nothing to do with Sagastegui's legal competency and did not speak to it. It was to determine "psychological factors which may have a bearing upon his request to live at the Special Housing Unit." Dr. Weber said that Sagastegui was "oriented and displayed no signs of mental or emotional illness or of impaired contact with reality." Dr. Weber told him that execution would be hard on Sagastegui's family to which Sagastegui told him that "there is no umbilical cord attaching him to anyone else, that he must make the decisions which he feels are in his own best interests, and again said that his death would make for more compelling lessons to others." Nothing in Dr. Weber's report suggests incompetence.
 
 
 102
 Dr. Page's May 7, 1998 evaluation of Sagastegui was "to assess possible psychosis and suicide potential." He noted that Sagastegui had been prescribed Depakote and Thorazine to "reportedly decrease his tendency to affective lability and promote sedation, enabling him to sleep 16 hours per day." He concluded that he posed "no imminent threat of suicidal potential" and appeared alert, well-oriented, and attentive. In a supplement to his report, Dr. Page listed his diagnosis as atypical psychosis, now in remission; alcohol abuse, now in remission; and "personality disorder NOS." Nowhere did Page suggest that Sagastegui was legally incompetent. The modifiers "remission" and "atypical" mean that whatever kind of psychosis Sagastegui might have, he was not showing symptoms when examined, and it was not one of the ordinary forms of psychosis.
 
 
 103
 The only recent evaluation of Sagastegui by any physician who has examined him is the report of Dr. Christian Harris on September 26, 1998, less than two weeks ago. Dr. Harris specifically examined Sagastegui to determine his "competency with regard to his continuing to represent himself as his own attorney." Dr. Harris could "find no evidence that this man's mental disorders are impacting his decision making in the legal processes involved in his pleading guilty and his decision not to appeal his death sentence." His diagnosis was antisocial personality. He found no evidence of "any hallucinatory deficit or delusional thinking" and noted that "his mental disorders do not seem to be the basis for his decision to not appeal his upcoming execution." Dr. Harris concluded that Sagastegui "wishes to be executed rather than serving life in prison without parole." He concluded by saying that he does not "consider that wanting to die is necessarily evidence that a person is demented or that a 'mental disorder' is necessarily causing the individual to wish for death."
 
 
 104
 In a follow-up letter, Dr. Harris analyzed the reports of Dr. Grubb, Dr. Page, and Dr. Weber. Though he disagreed with some of their diagnostic impressions, what is more important is that Dr. Harris pointed out that none of their diagnostic impressions conflicted with the conclusion that Sagastegui was competent to make his own litigation decisions. Dr. Harris noted that the medical records showed no evidence that Sagastegui has "decompensated" or been "near psychosis." Dr. Harris also disputed Dr. Grubb's diagnosis of bipolar disorder with depressive episodes, because there was no evidence of manic episodes. He concluded that Dr. Grubb's impression of "explosive disorder, probably related to bipolar disorder" and post-traumatic stress disorder, was not supported by their observations and evaluations. Dr. Harris pointed out that antisocial personality disorder has "nothing to do with the issue of 'competence' to act as his own attorney."
 
 
 105
 Dr. Harris is the only physician to have evaluated Sagastegui for legal competency since the "sanity commission" did so in 1996. Everything in Dr. Harris' report is consistent with the commission's earlier finding that Sagastegui was and is legally competent and that his mental disorders do not render him incompetent. I can find no evidence, "meaningful" in the restrictive sense of Demosthenes, Whitmore, Brewer, and Wells, to the contrary.
 
 
 106
 The majority suggest that we need another hearing, because the last one was 2 1/2 years ago. I do not see a basis for that in the authorities. Though Brewer mentioned that there had been a recent evidentiary hearing, it did not say that such a hearing was necessary. In this case, the district court gave careful consideration to all the medical reports, new and old, submitted by Sagastegui, and there is no apparent reason why an evidentiary hearing would differ from the argument and consideration of extensive written evidence in this case.
 
 
 107
 Appellant argues that because Sagastegui does not wish to avoid the death penalty, he must be incompetent. The conclusion does not follow. Sagastegui repeatedly told his doctors that his reason for wanting to allow the execution to proceed was to get out of prison. He showed an understanding of the significance, and fearsomeness, of execution. The manager of the correctional housing unit where Sagastegui is kept filed an affidavit that said when Sagastegui had learned of the Washington Supreme Court's decision affirming his death sentence, Sagastegui "shook, his lip was quivering, and he commented about only having 120 days to live." This shows that he understands and fears death. Sagastegui faces a choice between death and life imprisonment, and it is not evidence of craziness to the point of incompetence that a 27 year old man facing this choice thinks death to be the less miserable alternative. His behavior reinforces the prior state court findings of competency. Dr. Cressy of the "sanity commission" testified that "I would do the same thing."
 
 
 108
 This is not to say we should let Sagastegui die because he wants to. He forfeited his right to do what he wants when he murdered three people. His death will not be suicide. It will be punishment for the anal rape, stabbing and drowning of a three year old boy for whom he was babysitting, the murder of the boy's mother, and the murder of her friend. The state is entitled to execute him for these horrible crimes, and he is entitled to control his defense or the lack of it unless he is incompetent to do so.
 
 
 
 [1]
 The district court dismissed as moot Vargas's motions for a stay of execution and the state's motion for summary dismissal
 
 
 [2]
 A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. Diagnostic and Statistical Manual of Mental Disorders 20 (3rd. ed, rev.1987). A GAF score of 55 indicates at least moderate symptoms or moderate difficulty in social, occupational, or social functioning. Id. at 12
 
 
 [3]
 By new, we mean evidence that reflects Sagastegui's mental condition since the last state competency hearing
 
 
 [4]
 The State argues that such authority may be found in Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Sumner stands for the more narrow proposition that the findings of a state appellate court must be afforded the same presumption of correctness that applies to findings of a state trial court. Id. at 545-46, 101 S.Ct. 764. The findings at issue in Sumner, however, were express and made after a full hearing. Id. at 541-42, 101 S.Ct. 764
 
 
 [1]
 As I revise my draft, at 10:27 A.M. Alaska time Sunday October 11 (I wrote the rough draft yesterday afternoon), I have not been able to read the majority opinion, because it has not yet been received in my chambers. This case, like all eve of execution death penalty cases, suffers from the defects of deliberation caused by last-minuteness. We received faxes of the several reams of papers Thursday afternoon, read the record and precedents as best we could Friday, and heard oral argument and conferred Saturday morning. I indicated a tentative inclination to dissent, but said I might (as I have been before) be persuaded by the majority opinion and choose not to dissent. But the possibility of reading each others' views, articulated more carefully and extensively than is possible in conference, does not exist, because of last-minuteness. This morning when I came into chambers a fax was waiting for me from Judge Reinhardt, presiding, with a date line saying that it had been sent at 1:56 A.M., and that the majority opinion, with which he concurred, would be filed at noon Pacific time (11:00 A.M. my time). This requires me to dissent in ignorance of what the majority says, though I hope to receive and be able to skim the majority opinion before sending this dissent for filing. My dissent may therefore be unresponsive to whatever turns out to be in the majority opinion (which I have not yet seen), and deprives me of the opportunity to read the majority opinion carefully before deciding whether to dissent. It also deprives the majority of the opportunity to read my dissent before committing itself
 This failure of the deliberative process is a necessary consequence of the fact that the proposed next friend participation was not initiated at the end of 1995, when Sagastegui announced his intentions, but instead during the days immediately preceeding his execution.
 The Supreme Court has held that "A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." Gomez v. United States District Court, 503 U.S. 653, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992). Last-minuteness should indeed raise the bar, not only because it may reflect on the petitioner, but also because it impairs a court's ability properly to review the record and deliberate. The characteristic of death penalty cases, that they typically last for decades, results from the combination of last-minuteness and Zeno's Paradox (that a moving body can never reach the end of a line, because it must first cover half the line, then half the remainder, and so on ad infinitum). Last-minuteness makes mistakes in death penalty cases, in which mistakes are most intolerable, more likely to occur.
 This case is a striking illustration of Zeno's Paradox in operation. The state trial court did everything right. So did the state supreme court. The process of doing everything right took time. Because it necessarily took time, there was an interval of time between the mental examinations the state courts considered and the scheduled execution. That opened the door, as it necessarily does in any death penalty case, to an affidavit from an expert witness that something had occurred, or might have occurred, in the time interval. There is no logical end to the process.